## FELIPE GRETA v. THE STATE.

1. CHARGE OF THE COURT. — It is the right of the defendant in a felony case to have the issues presented to the jury distinctly and affirmatively, and in a manner comprehensible by unprofessional men.

2. SAME — MURDER. — In a trial for murder, the charge was so framed that the jury may have inferred from it that in case they found the defendant not guilty in the first degree, they must find him guilty in the second. The conviction was for the second degree. *Held*, that the charge was erroneous, because calculated to mislead the jury to the prejudice of the defendant.

APPEAL from the District Court of Bee. Tried below before the Hon. H. C. PLEASANTS.

The indictment was found by the grand jury of Live Oak County, and charged the appellant and his brother, Victoriano Greta, with the murder of Julian Andreda, by shoot-

ing him, in the said county of Live Oak, on August 10, 1879. On motion of the defendants a change of venue was ordered to the county of Bee, where, in October, 1880, the appellant was separately put on trial and found guilty of murder in the second degree, with a term of five years in the penitentiary assessed by the jury as his punishment.

It appears by the transcript that a statement of the facts was agreed to by the attorneys for the prosecution and the defence, but was not approved by the presiding judge; and consequently the rulings of this court involve only such questions of law as present themselves independent of the evidence.

The unauthenticated statement of facts shows that the appellant was the son-in-law of Andreda, the deceased, and indicates that the homicide was instigated by conjugal jealousy — an emotion which is generally assumed to be potent among the Mexican race, to which all the parties belonged. A good-natured friend was, as usual, the magician whose invocation called the evil spirit to its work.

The deceased and the defendant lived several miles apart, and about three weeks before the homicide the latter sent one of his employees, named Juan Enojosa, on an errand which took him by the house of the deceased, where the wife of the defendant then was. Enojosa, testifying for the defence, stated that as he passed the deceased's place he saw the defendant's wife and one Rafael hugging and kissing each other in a pen near the house of the deceased. When witness returned to the defendant's, the latter asked him if he had seen his (the defendant's) wife, and the witness replied that he had seen her playing with another man. Defendant did not say how he liked the information, and made no reply to the witness.

Alvina Andreda, the widow of the deceased, testified that, two days prior to the homicide, she and the deceased went to the defendant's after their daughter Pabla, the wife of defendant. They went for that purpose at the defendant's

request, and found him at home and seemingly willing for his wife and children to go home with witness and her husband, which they did. That night the defendant came to the house of the deceased, and seemed displeased at seeing his baby fondled by a stranger who was there. He said he did not want the man to be fondling the child, for if he did that he would soon be fondling its mother; and, becoming angry, he said he did not want his wife any more, but would come back in two years and get his child. Two days after this, the defendant and his brother Victoriano, both armed, rode up to the house of the deceased and came in, spoke to all who were in the house, and seemed friendly. Deceased told witness to make some coffee, and she went outside the house to do so, leaving in the house the defendant, his brother, wife and child, the deceased, and Jesus, a son of witness, besides two other children. While witness was outside the house she heard the defendant say to the deceased, " Please let me take my child from your house;" to which the deceased replied, " The child is yours, and you can take it and the rest of your family if you want to." Then the witness heard several shots, and ran to the door, exclaiming, " What are you killing my family for?" She saw Victoriano shoot the deceased with a gun, and the defendant with his child in his arms and a pistol in his hand. The defendant told his brother to shoot witness, and to " kill them all." Victoriano then shot at witness, and she ran behind the house. When the shooting ceased, the defendant's wife opened the door at the back of the house for witness, who went in and found her husband lying across a chair, wounded by a shot in the side, one in the breast, and another in the hand. He died within a few hours after receiving them. The defendant, after the shooting, left the house, accompanied by his brother, and taking his child with him.

On the cross-examination of this witness she was asked if, at the examining trial of the defendant, soon after the

homicide, she did not state that the reply of the deceased to the defendant's request for his child was, "You can have your child when things are straightened out and settled." The witness denied that she had so testified, and the defence subsequently introduced the record of the examining trial, according to which her former testimony was in accordance with the version of the defence.

Jesus Andreda, a son of the last witness and the deceased, aged between ten and fourteen, testifying for the State, said that he was in the house when the defendant and his brother came. He gave the same version as his mother of the colloquy between the defendant and the deceased respecting the child, which was then in the arms of its mother, the defendant's wife. He stated that when the deceased told the defendant he could take his child and the rest of his family, the latter jumped up and caught the child with one hand, and with the other pointed a pistol at his wife's breast. The deceased seized the barrel of the pistol, and it was fired and wounded his thumb. Witness took fright and ran out of the house.

Defendant introduced evidence of good character for peacefulness.

*Lane & Payne*, for the appellant, filed an able brief and argument.

*Thomas Ball*, Assistant Attorney-General, for the State.

White, P. J. Appellant and one Victoriano Greta were jointly indicted for the murder of Julian Andreda. Appellant was alone placed upon trial, and was found guilty of murder in the second degree, his punishment being assessed at five years' confinement in the penitentiary.

After having in general terms charged the jury appropriately with regard to the character, constituent elements, and distinguishing features of murder in the first

and murder in the second degree, and the law of principal offences, the court proceeded to make a direct application of the law to the facts, in the following terms, viz.: "If the jury believe from the evidence that the murder charged in the indictment was committed as therein charged, and that the defendant was a principal in the commission of the offence; and if they further believe that the murder was committed, on the part of the defendant, with formed design and with a sedate and deliberate mind, they should find the defendant guilty of murder of the first degree, and should assess the punishment at death or at imprisonment in the penitentiary for life. On the other hand, if the jury believe from the evidence that the defendant is a principal in the murder charged in the indictment, but do not believe the murder was committed with formed design and sedate mind, they should acquit the defendant of murder in the first degree and should convict him of murder in the second degree, and should assess his punishment at imprisonment in the penitentiary for any definite period of time, provided it be not of less duration than five years; and so, if the jury believe that the defendant was a principal in the murder charged against him in the indictment, but have a reasonable doubt whether the murder was committed, on the part of the defendant, with formed design and with sedate and deliberate mind, they must acquit him of murder of the first degree, and should convict him of murder of the second degree."

Objection is made to that portion of this charge which relates to murder in the second degree, the crime of which defendant was convicted. Connected as this portion is with the charge upon murder in the first degree, we cannot say that it assumes as a fact that a murder was committed by defendants. The two portions of the charge, however, are obnoxious to the objection that they are so blended, and the latter so made to depend upon the former as that the unprofessional mind of a jury might experience

difficulty in fully and clearly comprehending the meaning. A defendant is entitled to a distinct and affirmative, and not merely an implied or negative presentation of the issues. *Reynolds* v. *The State*, 8 Texas Ct. App. 412. We are clearly of opinion that the objection that the charge is so worded as that the jury may have inferred that they must in any event find murder in the second degree is well taken. We are borne out in this view by an examination of the remaining portions of the charge. In no other portions of the charge are the jury instructed as to the reasonable doubt with regard to murder in the second degree directly, whilst it is to be noted that it is made directly to apply to murder in the first degree, in the conclusion of the paragraph quoted, and in such manner that the jury might well have concluded that if they entertained a reasonable doubt as to murder in the first, " they should," in the language of the charge, " convict him of murder of the second degree " alone, on account of the reasonable doubt as to murder in the first degree.

Because the charge of the court was calculated to mislead the jury, and thereby injure the rights of the defendant, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*